DAVID L. ZIPS AND MARIE ZIPS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

DAVID L. ZIPS AND MARIE MCCALLY ZIPS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 84836, 90089. Filed August 14, 1962.

*Code E. Edwards, Esq.*, for the petitioners.
*E. J. Eagleton, Esq.*, for the respondent.

PIERCE, *Judge:* The respondent determined deficiencies in the income taxes of petitioners, for taxable calendar years and in amounts as follows:

| Docket No. | Year | Deficiency |
| --- | --- | --- |
| 90089 | 1955 | $109,968.84 |
| 84836 | 1956 | 69,589.72 |

The cases were tried on a consolidated basis.

The issues for decision are:

(1) Whether cash and securities of the value of approximately $169,661, which petitioner Marie Zips received in 1955 from an elderly and eccentric man called George, and which she thereafter held and used as her individual properties under her complete dominion and control, *are excludible* from her gross income for said year under section 102(a) of the 1954 Code, as "property acquired by gift"; and, if not so excludible, whether the value of said properties *is includible* in Marie's gross income for said year 1955.

(2) Whether Marie and her husband realized taxable income in the subsequent year 1956, where, after it had been judicially determined that George was not legally competent to make any valid gift of said properties at the time he transferred the same to Marie, and after the corporate fiduciary for the estate of said incompetent had obtained a judgment against Marie and her husband for the full value of said properties, they paid said fiduciary less than one-third of the amount of the judgment and obtained from it a release from any further claim.

(3) Whether assessment and collection of any deficiency against petitioners for the year 1955 are barred by the statute of limitations.

All other issues raised by the pleadings are dependent upon the outcome of the above-stated issues.

### FINDINGS OF FACT.

Some of the facts, including portions of the record in a related United States District Court case hereinafter mentioned, have been stipulated. The stipulation of facts, and all the exhibits thereto attached, are incorporated herein by reference.

Petitioners David L. Zips and Marie McCally Zips are husband and wife, residing in Fort Worth, Texas. They filed a joint Federal income tax return on the cash basis for each of the taxable years here involved, with the district director of internal revenue at Dallas.

Petitioner Marie McCally Zips (hereinafter called Marie) was married to David on June 2, 1955. Prior thereto, she was an unmarried woman named Marie McCally, living in Fort Worth.

In February 1955, which was prior to Marie's marriage, she went to Amarillo, Texas, for a short visit; and while there she became acquainted with a man named George Westinghouse, Jr. (hereinafter called George). George was a widower of about 73 years of age, who was a resident of British Columbia, Canada, and who had grown children living there. At the time he was traveling alone in Texas, going from place to place in a station wagon, and staying at various motels. Marie was not related to him by blood or marriage, and she had never known him before. About 2 days after making his acquaintance, Marie returned to her home in Fort Worth; but before her departure,

George asked if he might go there to see her. She indicated that he might do so; and shortly thereafter, George drove to Fort Worth where he remained for about 2½ months—living for short periods at a time in each of two motels and an apartment. During this period Marie visited him almost every day.

George was a very eccentric person. He was careless both in his personal appearance and in almost everything he did. He did not eat regularly or well; and he often would forget to eat his meals unless Marie reminded him. He drank large quantities of wine, and used barbiturates excessively—with the result that at times he fell into a deep sleep from which it was difficult to arouse him. On one such occasion, he went into a stupor while smoking and set his room afire. He drove his car recklessly, without observing traffic regulations; and in one instance spent all night and drove almost 40 miles into the country, in attempting to locate the motel where he was staying. During most of the period that he was in Fort Worth, he received medical treatment from a physician. Marie felt that he should have someone to look after him; and accordingly she frequently would assist him with his meals, drive him to the doctor's office, accompany him to a moving-picture theater, or take him for a ride in her car. She suggested that he should communicate with his children in British Columbia and have one of them come to Fort Worth and take him home; but George would not agree.

About 2 weeks after George arrived in Fort Worth, he transferred to Marie about $50,000 worth of various corporate securities, which apparently were then being held for him in some out-of-town bank or brokerage account. In this connection, he took Marie to a broker's office in Fort Worth; introduced her to the management; and said that he was transferring some stocks to her. Shortly thereafter Marie received, either through the mail or the local bank, the certificates for these stocks which were all issued in her name alone; and she thereupon took the certificates to her bank and placed them in a safe-deposit box to which she alone had access. Thereafter, at 2- or 3-week intervals until May 10, 1955, George made additional transfers to Marie of other shares of corporate stock of substantial value. As to these, Marie did not know she was getting them until the bank had called and advised her that it had received the certificates. She would then go to the bank; accept these certificates which, like the prior ones, were all issued in her name alone; and place these also in her safe-deposit box.

Also, from time to time during this same period, George transferred to Marie various sums of money totaling nearly $45,000. He made the first of such transfers by endorsing over to her certain checks which he had in his possession; and he paid her other portions of said amount in cash. In addition, he gave her a beaver jacket and miscellaneous

items of jewelry—none of which is directly involved in this case. Marie deposited the cash, either in her individual checking account or in her individual savings account at a Fort Worth bank; and she thereafter used portions of the same to make mortgage payments on her car or her home, and for other personal purposes.

A summary of the total cash and various shares of stock which George thus transferred to Marie during the period from March 9 to May 10, 1955, and the stipulated values of the same, is as follows:

| Property | | Value |
|---|---:|---:|
| Cash | | $44, 971. 74 |
| Stocks: | | |
| 400 shares Interlake Steamship Co | $14, 334. 19 | |
| 500 shares Norfolk & Western Co | 32, 638. 94 | |
| 300 shares General Refractories Co | 12, 888. 00 | |
| 500 shares Singer Mfg. Co | 21, 371. 90 | |
| 100 shares Pittsburgh & L. Erie Railroad | 9, 826. 00 | |
| 600 shares Flying Tiger Line Co | 4, 900. 00 | |
| 200 shares Belmont Iron Works | 6, 545. 90 | |
| 400 shares General Refractories Co | 17, 184. 28 | |
| 107 shares Bendix Aviation Co | 5, 000. 00 | 124, 689. 21 |
| Total | | 169, 660. 95 |

No consideration was received by George, either from Marie or anyone else, for his transfer of any of the above cash or properties. The various courtesies that Marie extended to George during their acquaintanceship were mere gratuitous acts of friendship which were not intended by either of them to be, and were not, consideration for any of said properties.

Marie thought it was "a little unusual" for George to be transferring these properties to her; and on one occasion while she was driving around with him, she discussed the matter. The explanation George gave her was that he had all the money he needed; that he was elderly, and his children were well provided for; and that he wanted to give Marie enough money to take care of her the rest of her life.

On May 10, 1955, George left Fort Worth alone in his station wagon, with the announced intention of driving to British Columbia. About 2 weeks later, George called Marie on the telephone from Arizona, and told her that he had there had an accident. Marie never saw him or heard from him again.

On April 17 of the following year 1956, Marie and her husband whom she had married in the meantime, were served with a summons and complaint in an action in the United States District Court in Fort Worth, which had been filed against them by the Royal Trust Company, a Canadian corporation. Said complaint alleged, in substance and in principal part, as follows:

That the action had been filed in said court on the basis of diversity of citizenship.

That the plaintiff, the Royal Trust Company, had been appointed by the Supreme Court of British Columbia as the receiver or quasi-committee of the estate of George Westinghouse, Jr., a person of unsound mind (being the person from whom Marie had received the above-mentioned properties) ; and that the defendants were holding and claiming various specified amounts of cash and property belonging to plaintiff and its said ward (being the cash and shares of stock here involved).

That such cash and property had been transferred by plaintiff's said ward to Marie in the first half of 1955, at a time when George was of unsound mind and lacking the mental and legal capacity necessary to effect a valid transfer of the same. That, in the alternative, Marie had caused George to transfer said money and property to her by exerting undue and improper influence on him at a time when he was incapacitated, debilitated, and of unsound mind. That, in the further alternative, Marie had acted in a fraudulent manner in persuading George to transfer said money and property to her at a time when she knew him to be incapacitated and of unsound mind. And that no consideration was paid to George, either by Marie or by any other person, for said money and property.

The plaintiff then prayed, in substance and in part: (1) That the defendants be cited to appear and answer the complaint; (2) that the defendants be enjoined from selling or otherwise disposing of said property and money, pending final determination of the cause; and (3) that upon final hearing of the cause, said transfers of property and money be set aside and held for nought for all purposes, that the plaintiff be adjudged the rightful owner of said property and money and be awarded a judgment for recovery of the same, or in the alternative, that the plaintiff be awarded a judgment for the present value of said property and money.

Marie, upon being served with the summons and complaint in said action, went immediately to her bank and, on that and the 2 following days, withdrew from her savings and checking accounts a total of $18,567.25—thereby reducing the aggregate balance in her accounts to $200. Also, between the day she was served with said summons and 12 days thereafter, she withdrew from her safe-deposit box and sold, all the remaining shares of stock which George had transferred to her, except the shares of one stock with respect to which the Royal Trust Company succeeded in blocking the transfer. The record herein does not show, either what disposition Marie made of the cash which she so withdrew from her bank, or what disposition she made of the proceeds from her sales of said securities.

Marie and her husband filed an answer to the above-mentioned complaint; and in this answer they denied all the allegations of the complaint except for their admission that there was no legal or blood

relationship between George and Marie. Following the filing of the answer, the plaintiff trust company proceeded with its action; and it took a deposition of Marie relative to the gifts involved and the disposition which she had made of the same.

Thereafter on May 23, 1956, which was shortly subsequent to the taking of Marie's deposition, the attorney for Marie and her husband presented to the attorney for the plaintiff trust company, a letter which is described in the stipulation of facts as a "proposal for settlement in the District Court case." This proposal was in substance, that the parties agree to proceed with respect to the pending court action in the following manner:

That plaintiff would obtain a judgment against the defendants for the full amount of its claim as set forth in the complaint—"for the reason that after full and complete investigation, we are in agreement that George Westinghouse, Jr., was of unsound mind and lacking mental and legal capacity necessary to effect a valid transfer of any property during the time that he knew the Defendant, Marie McCally, during the first half of 1955."

And that, after such a judgment had been obtained, the plaintiff would accept from the defendants, in full and complete settlement of the judgment and all claims of the plaintiff and its ward against the defendants, certain shares of stock of two specified corporations, and two specified parcels of real estate. (Only one of the stocks so specified, and none of the specified real estate, had been included in the properties which George had transferred to Marie.) This letter of proposal, as received in evidence, bears the signature of an attorney for each of the parties, affixed opposite the word "Approved."

About 1 week later, on May 30, 1956, the plaintiff trust company took another deposition of Marie, respecting the transfers in question. And then on June 9, 1956, the District Court judge conducted the trial of the case; filed a memorandum of decision in favor of the plaintiff trust company; and entered judgment for said plaintiff and against the defendants, in the sum of $169,661.25, together with interest and costs of suit.

The above-mentioned memorandum of decision of the District Court (which is included in the record of the instant case by stipulation of the parties hereto) sets forth extended findings of fact and holdings which may be summarized as follows:

That the court had arrived at its decision after hearing, receiving, and considering both testimony and other evidence, and after considering also the pleadings in the case and arguments of counsel.

That on July 13, 1955 (which was subsequent to the time of the transfers involved), George had been found by the Supreme Court of British Columbia to be a person of unsound mind, and had been committed under order of such court, to a mental institution in British

Columbia where he had continued to remain as a patient since said date.

That from March to May 1955, George had transferred and delivered to Marie substantial amounts of cash and shares of stock of various specified corporations (being the cash and stocks hereinabove listed and described); that during said time and for a considerable period prior thereto, George had "lacked the requisite mental capacity to effect a valid gift"; and that for such reasons "the aforesaid gifts of money and property to said defendant, Marie McCally Zips, should be set aside, rescinded and held for nought by this Court"; and

That the court being of the opinion that the plaintiff should recover as prayed for in the complaint, and it further appearing to the court that said defendant Marie had theretofore sold and transferred the above-mentioned shares of stock and had received therefor the sum of $124,689.51, in addition to the sum of $44,971.74 in cash which she had theretofore received from George, the plaintiff should recover from the defendants Marie and her husband, the sum of $169,661.25, together with interest and costs of suit.

Subsequently on or about June 14, 1956, the defendants delivered to the plaintiff trust company by reason of its recovery of the above-mentioned judgment, cash and property of the total value of $48,-445.90; and said plaintiff then executed and delivered to said defendants, a written release, under which it discharged them from said judgment of $169,661.25, and also from "any and all liens, claims and demands theretofore existing by reason thereof."

Marie and her husband, in their joint income tax return for the year 1955, reported total gross income of $4,516—being the amount of dividends which Marie had received in said year on the several stocks which George had transferred to her. And in their joint return for the following year 1956, they reported total gross income of $2,462.50—being the amount of dividends which Marie had received on these same stocks during that portion of the year 1956 which preceded her sale of the same.

The respondent issued his notice of deficiency herein for the year 1956 (Docket No. 84836), on October 23, 1959 (which was within 3 years from the due date of the petitioners' joint return for that year); and he determined therein that petitioners had in said year realized unreported income of $121,215.35 from the discharge of indebtedness due the Royal Trust Company in the amount of $169,661.25, by delivering cash and property of the value of $48,445.90 in settlement of said debt. On the basis of this adjustment, respondent determined the above-mentioned deficiency of $69,589.72 against petitioners for 1956.

Subsequently on August 30, 1960, respondent issued his notice of deficiency against petitioners for the year 1955 (Docket No. 90089);

and in this, he determined that during said year Marie had received from George Westinghouse, Jr., unreported cash and securities of the value of $169,661.25, which were includible in petitioners' gross income for that year under the provisions of section 61(a) of the 1954 Code. By reason of this and certain other minor adjustments, respondent determined the above-mentioned deficiency for 1955 in the amount of $109,968.84. He further determined that petitioners' gross income for said year had been understated by more than 25 percent; and that therefore, the 6-year statute of limitations provided by section 6501(e)(1)(A) of the 1954 Code was applicable.

#### ULTIMATE FINDINGS OF FACT.

During the period from March to May 1955, inclusive, George was a person of unsound mind who lacked the requisite mental capacity to effect a valid gift; and for said reasons the cash and securities which Marie received from him during said period were not properties acquired by gift.

The petitioners omitted from the gross income reported in their 1955 income tax return, an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in said return; and for this reason, assessment and collection of any deficiency for said year are not barred by the statute of limitations.

#### OPINION.

#### *I.*

The first issue for decision is whether the cash and securities of the value of approximately $169,661, which petitioner Marie Zips received in 1955 from George Westinghouse, Jr., and thereafter used and held as her individual property under her complete dominion and control, are *excludible* from her gross income for said year under section 102(a) of the 1954 Code, as "property acquired by gift"; and, if not so excludible, whether the value of the same is *includible* in Marie's gross income for said year 1955.

1. Section 102 of the 1954 Code provides in part:

(a) GENERAL RULE.—Gross income does not include the value of property acquired by gift * * *

The position of the present petitioners is that the cash and securities involved qualify for exclusion from gross income under the above statute because George voluntarily transferred the same to Marie without consideration. But we think that, as the Supreme Court recently stated in its decision in *Commissioner* v. *Duberstein*, 363 U.S. 278, 285, a voluntary executed transfer of property without any consideration or compensation therefor is not necessarily a "gift" within the meaning of the above statutory exclusion.

One of the requirements necessary to constitute a valid gift inter vivos is that there must be a donor legally competent to make a gift. *Edson* v. *Lucas*, 40 F. 2d 398, 404 (C.A. 8); *Daniel M. Cory*, 23 T.C. 775; *Estate of Lorenzo W. Swope*, 41 B.T.A. 213; and *Adolph Weil*, 31 B.T.A. 899. In the absence of this essential requirement, an attempted gift is void and without legal effect. *Heldenbrand* v. *Stevenson*, 249 F. 2d. 424, 428 (C.A. 10); *Henneberger* v. *Sheahan*, 278 S.W. 2d 497, 498–499 (Tex. Civ. App.); 1 Mertens, Law of Federal Income Taxation, sec. 7.12. The above exclusion statute makes no exception for a situation where the recipient is mistaken in believing that there was a gift, but where the purported gift actually was void and of no effect. As the Supreme Court further said in the above-cited *Duberstein* case (p. 286): "It scarcely needs adding that the parties' expectations or hopes as to the tax treatment of their conduct in themselves have nothing to do with the matter."

The present petitioners have not disputed that George was incompetent to make a valid gift at the time he transferred the cash and securities to Marie; and there is positive stipulated evidence that he actually was incompetent. In the first place, such incompetency was judicially determined by the United States District Court in the action which George's fiduciary filed for the specific purpose of establishing such incompetency as a basis for recovering the transferred property. That court, after hearing testimony and considering other evidence, stated as follows:

that at some time during the summer months of 1954, George Westinghouse, Junior began to exhibit obvious signs of existing organic cerebral deterioration and cerebral atrophy and underwent a mental change and personality change to such an extent that he was thereafter incapable of properly managing his own affairs, and was subject to such infirmity of mind at all times thereafter that he was incapable of understanding substantially the nature and effects of his actions, * * * that George Westinghouse, Junior lacked the requisite mental capacity to effect a valid gift during the period of time from and after the summer of 1954 to the present time [June 9, 1956]; * * *

Secondly, during the pendency of the above District Court case, counsel for Marie and her husband addressed a letter to the counsel for the fiduciary, in which it was proposed that judgment be entered against the defendants for the full amount of the plaintiff's claim—

for the reason that after full and complete investigation, we are in agreement that George Westinghouse, Jr., was of unsound mind and lacking mental and legal capacity necessary to effect a valid transfer of any property during the time that he knew the Defendant, Marie McCally, during the first half of 1955.

And finally Marie, in one of the depositions which she gave in said action, made the following answers to questions relating to George's competency:

Q. Based upon your observation of him [George] over this period of time [from February to May 1955], what is your opinion about whether or not he

was competent to manage his own affairs, his personal affairs, and his business affairs?

A. No, I don't think that Mr. Westinghouse would have been competent to have done that.

Q. You don't think he was competent to do that?

A. No, sir, I don't.

We have hereinbefore found as an ultimate fact on the basis of all the evidence, and we here hold, that George was of unsound mind at the times of the transfers involved; that he lacked the requisite mental capacity to make any valid gift to Marie during such times; and that the cash and securities which Marie received from him were not "property acquired by gift" within the meaning of section 102(a) of the 1954 Code. It follows that the value of the same is not excludible from Marie's gross income under that section.

2. Having thus held that the cash and securities involved are *not* *excludible* from Marie's gross income as "property acquired by gift," we think there can be no reasonable doubt that the value thereof is *includible* in her gross income for the year 1955, when she received said properties and thereafter held and used the same under her complete dominion and control. And we hold that such value is so includible.

Section 61(a) of the 1954 Code defines gross income as follows:

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle [Subtitle A—Income Taxes], gross income means all income from whatever source derived, including (but not limited to) the following items: * * *

Subsection (b) of this same section then makes reference to the items specifically excluded from gross income, which are those covered by sections 101–119, inclusive. And the only one of these sections having any possible relevancy here is section 102 relating to "property acquired by gift," which we have hereinabove held is not presently applicable.

It now is judicially settled that "gross income" within the meaning of the above-cited statute, includes economic gains not covered by any specific statutory exclusion—even though the same were realized without cost or consideration. In *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. 426, wherein the taxpayer had recovered treble damages in an antitrust case, the Supreme Court pointed out the broad scope of section 22(a) of the 1939 Code (which it recognized to be cognate to section 61(a) of the 1954 Code). It stated in part as follows:

This Court has frequently stated that this language ["gains or profits and income derived from any source whatever"] was used by Congress to exert in this field "the full measure of its taxing power." [citing cases] * * * Congress applied no limitations as to the source of taxable receipts, nor restrictive labels as to their nature. And the Court has given a liberal construction to this broad phraseology in recognition of the intention of Congress to tax all gains except those specifically exempted. * * * [citing cases] Such decisions demon-

strate that we cannot but ascribe content to the catchall provision of § 22(a), "gains or profits and income derived from any source whatever." The importance of that phrase has been too frequently recognized since its first appearance in the Revenue Act of 1913 [5] to say now that it adds nothing to the meaning of "gross income."

\*  \*  \*  \*  \*  \*  \*

Here we have instances of undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion. \* \* \*

\* \* \* It therefore cannot be said with certitude that Congress intended to carve an exception out of § 22(a)'s pervasive coverage. Nor does the 1954 Code's [9] legislative history, with its reiteration of the proposition that statutory gross income is "all-inclusive," [10] give support to respondents' position. The definition of gross income has been simplified, but no effect upon its present broad scope was intended. [11] \* \* \* We would do violence to the plain meaning of the statute and restrict a clear legislative attempt to bring the taxing power to bear upon all receipts constitutionally taxable were we to say that the payments in question here are not gross income. \* \* \* [Footnotes omitted.]

To the same effect that it was the intention of Congress to tax all gains except those specifically exempted, see *Commissioner* v. *Jacobson*, 336 U.S. 28, 49.

3. There remains the question of whether, notwithstanding that Marie received all of the cash and securities involved in 1955 and thereafter held unfettered dominion and control over the same, she may nevertheless escape the inclusion of their value in her 1955 income by reason of the facts that she did not acquire valid title to the properties, and hence that her continued use and possession of them were assailable by someone with a better title. We are convinced that this question must be answered in the negative.

In *Rutkin* v. *United States*, 343 U.S. 130, 137, the Supreme Court said with respect to funds which had been acquired by extortion:

An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. *Burnet* v. *Wells*, 289 U.S. 670, 678; *Corliss* v. *Bowers*, 281 U.S. 376, 378. That occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will, even though it may have been obtained by fraud and his freedom to use it may be assailable by someone with a better title to it.

Such gains are taxable in the yearly period during which they are realized. This statutory policy is invoked in the interest of orderly administration. "[C]ollection of the revenue cannot be delayed, nor should the Treasury be compelled to decide when a possessor's claims are without legal warrant." *National City Bank* v. *Helvering*, 98 F. 2d 93, 96. \* \* \*

The above principle of the *Rutkin* case was recently recognized by Mr. Chief Justice Warren in his opinion in *James* v. *United States*, 366 U.S. 213, wherein after citing both the *Rutkin* and the *Glenshaw Glass Co.* cases he said:

When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required

to return [for income tax purposes], even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." *North American Oil* v. *Burnet, supra*, at p. 424 [286 U.S. 417]. In such case, the taxpayer has "actual command over the property taxed—the actual benefit for which the tax is paid," *Corliss* v. *Bowers, supra* [281 U.S. 376]. This standard brings wrongful appropriations within the broad sweep of "gross income"; it excludes loans. When a law-abiding taxpayer mistakenly receives income in one year, which receipt is assailed and found to be invalid in a subsequent year, the taxpayer must nonetheless report the amount as "gross income" in the year received. *United States* v. *Lewis, supra* [340 U.S. 590]; *Healy* v. *Commissioner, supra* [345 U.S. 278]. * * *

To the same effect see *Eugene H. Walet, Jr.*, 31 T. C. 461, 468–470; *Phillips* v. *Commissioner*, 238 F. 2d 473 (C.A. 7), affirming 25 T. C. 767; and *Prokop* v. *Commissioner*, 254 F. 2d 544 (C.A. 7), affirming a Memorandum Opinion of this Court.

We hold that the foregoing principles are applicable in the present case; and that the stipulated value of the cash and securities which Marie received from George in 1955 and over which she had complete dominion and control throughout said year, are includible in her 1955 gross income.

## II.

The second issue for decision is whether Marie and her husband realized taxable income in the subsequent year 1956 where, after the fiduciary for George's estate had obtained a judgment against them in the sum of $169,661.25, in an action for recovery of the properties, they paid said fiduciary only a portion of the amount of such judgment and received a release from any further claim thereon.

Respondent, on brief, has made it clear that his attempt to tax the petitioners with the realization of income in 1956, is an alternative to his position on the foregoing first issue. We think that such alternative position must be rejected.

Underlying the respondent's said alternative position is the theory that the petitioners realized income through discharge of a judgment debt owing to the fiduciary of George's estate, by paying said fiduciary less than the full amount of such indebtedness. But all the improvement in Marie's net worth resulting from her acquisition of George's properties (and it should be observed that improvement in wealth lies at the heart of the theory of taxing gain realized from discharging indebtedness at less than the face amount—see *Commissioner* v. *Jacobson, supra*) has already been included in Marie's 1955 gross income under our holding on the first issue herein. Accordingly, we find no warrant for taxing a portion of this same improvement in net worth a second time, after she and her husband had made partial restitution to the fiduciary. We therefore decide this second issue for the petitioners.

As regards the partial restitution which petitioners made to the fiduciary in the year 1956, it is to be observed that Congress has made provision in section 1341 of the 1954 Code to eliminate inequity in certain situations, where a taxpayer has made restitution of "an item [which] was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item." Under this statute, where applicable, adjustment is made only for the year in which the restitution was made; and no adjustment is made to the amount of the tax for the earlier year. Whether or not the present petitioners can qualify for relief under said section 1341 is a question that is not at issue here, and which has not been mentioned or dealt with on brief by either party. Accordingly, such question is not before us; and we express no opinion with regard thereto.

## III.

The third issue for decision is whether assessment and collection of any deficiency for the year 1955 are barred by the statute of limitations.

We have hereinabove held under Issue I, that Marie's gross income for the year 1955 should be increased by the amount of $169,661.25. And this amount is far in excess of 25 percent of the gross income of $4,516 which, as we have found as a fact, was reported by her and her husband on their joint income tax return for 1955. Section 6501(e)(1)(A) of the 1954 Code provides that in such circumstance, a 6-year period of limitation is applicable. The Commissioner issued his notice of deficiency for the year 1955 within such 6-year period.

We decide this issue for the respondent.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

———

SCOTT, *J.*, dissenting: I cannot agree with the conclusion reached by the prevailing opinion that since in 1956 the attempted gift by George to Marie was declared void, the cash and value of the properties he transferred to her in 1955 are includible in her gross income in that year. Section 102 of the Internal Revenue Code of 1954 specifically provides that gross income "does not include the value of property acquired by gift." Whatever rights or claims Marie had to the property in 1955 were "acquired" by her by gift. If the exclusion of section 102 of the Internal Revenue Code of 1954 is inapplicable to the cash and property transferred by George to Marie, it would follow that Marie did not hold the property in 1955 under a claim of right. In *James* v. *United States*, 366 U.S. 213 (1961), the opinion of the Chief Justice considered inconsequential "that an embezzler may lack

title to the sums he appropriates while an extortionist may gain a voidable title." In the instant case, therefore, it is inconsequential whether George's gift of cash and property to Marie was void or voidable because of his lack of competency to make a valid gift. At the end of 1955 Marie had the property under her free dominion and control and thus under the rationale of the *James* case had a claim of right thereto which was acquired by gift, a type of receipt specifically excluded from the definition of income. If the reasoning of the prevailing opinion is followed to its logical conclusion, the value of any property received as a gift should be included by the recipient in income in the year so received, since at some subsequent date, prior to a statute of limitations barring its validity being attacked, the gift might be declared to be void. Applying *James* v. *United States, supra*, to the instant case, I would hold that Marie received no income in 1955 from George's transfer to her in that year of cash and properties, her claim of right thereto being as a gift.

I would not hold that Marie received income in 1956 from the forgiveness of indebtedness. The facts show that the judgment of the District Court was entered in accordance with an agreement between the parties to settle the case. The agreement of the Royal Trust Company to accept the stock and real estate valued at $48,445.90 in full satisfaction of the judgment was as much a part of the settlement as was Marie's agreement to the entry of that judgment. Since prior to the entry of the judgment, there existed an agreement between the parties to the suit as to the amount the defendants (the petitioners herein) would pay to plaintiffs, no actual indebtedness in excess of the agreed amount of the payment was created by entry of the judgment. Cf. *N. Sobel, Inc.*, 40 B.T.A. 1263 (1939).

WITHEY and MULRONEY, *JJ.*, agree with this dissent.