Alfred Altman and Irene Altman v. Commissioner
Altman v. Commissioner
Docket No. 1157-68.
United States Tax Court
T.C. Memo 1972-26; 1972 Tax Ct. Memo LEXIS 229; 31 T.C.M. (CCH) 91; T.C.M. (RIA) 72026; February 2, 1972, Filed. Harry Simon, for the petitioners. Michael K. Phalin, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1964 in the amount of $78,364.45. The issues for decision are: (1) Whether $122,535.36 in cash and securities transferred to petitioner Alfred Altman by Charlotte Altman on December 15, 1964, is includable *230 in petitioners' gross income for the taxable year 1964. (2) If the $122,535.36 is includable in petitioners' gross income for the taxable year 1964, whether petitioner Irene Altman is relieved of liability under section 6013(e), I.R.C. 1954, [1] for the deficiency in income tax for the taxable year 1964 to the extent such liability is attributable to the omission from petitioners' gross income of $122,535.36. (3) Whether petitioners are entitled to claimed itemized deductions for the taxable year 1964 for interest paid, for contributions, and for taxes paid of $311.27, $300, and $1,754.62, respectively, or any portion of these claimed deductions. Findings of Fact Petitioners Alfred and Irene Altman, husband and wife, at the time they filed their petition herein resided outside the United States. They filed a joint Federal income tax return for the taxable year 1964 with the district director of internal revenue, New York, New York. Alfred Altman (Alfred) is the son of Arthur Altman (Arthur) and Charlotte Altman (Charlotte) and is the brother of Adele Altman Phillips (Adele). Arthur and Charlotte organized and *231 managed a bakery business in New York City consisting of four closely held corporations: Strudel Corp. of America; Eighth Avenue Strudel Corp.; Mrs. Altman and DeLuxe Strudel Co., Inc.; and Home Made Strudel Corp. From 1945 until his death in 1963, Arthur's failing health required Alfred's presence to assist in 92 running the businesses. A few years before his father's death, Alfred assumed full management of the businesses. Alfred's only equity in the businesses was a 30 percent holding of the shares of one company, Strudel Corp. of America. Arthur, by will, left all of his assets including his interests in the family businesses to his wife, Charlotte. Following Arthur's death, Charlotte was the sole owner of the four companies except for the shares held by her son Alfred. Alfred continued to manage the family businesses after his father's death. Adele came to live with her mother, Charlotte, shortly after Arthur's death in December 1963 but also maintained an apartment of her own until about March 1966. In the early part of 1964 and on a number of occasions thereafter conferences respecting the control of the Altman family businesses were held in the office of an attorney *232 by the name of Miller (hereinafter referred to as Miller) at which Alfred, Adele, Charlotte, and Miller were present. Miller had for many years represented Arthur and the Altman family businesses. A proposed agreement regarding the control of the businesses was drafted by Miller in September 1964, but Charlotte refused to sign it. Miller advised Charlotte not to turn over control of the stock of the family corporations to Alfred. On November 25, 1964, Charlotte executed a will in which she left 51 percent ownership interest in the family businesses to Alfred and 49 percent to Adele. Except for some specific bequests to Adele, the remainder of the estate was to be left to Alfred and Adele equally, share and share alike. During the week prior to December 15, 1964, Irene Altman (Irene) and Charlotte spoke to each other daily on the telephone. On December 15, 1964, Charlotte telephoned Irene about 8 a.m. and asked for Alfred. Irene informed Charlotte that Alfred was either at work or on his way over to Charlotte's apartment. At 11 a.m., Charlotte and Alfred arrived at Alfred and Irene's apartment. The proceeds of four bank accounts totaling $62,007.86 and securities of the total *233 value of $60,527.50 were transferred to the name of Alfred from Charlotte. The amounts withdrawn from the four banks were in the form of teller's checks made payable to Alfred. At Irene's apartment on December 15, 1964, in the presence of Alfred, Irene and Irene's father, Joseph Simon, Charlotte gave the checks on the four banks totaling $62,007.86 to Alfred. She also gave Alfred the following securities: 200 shares of Ekco Products, Inc.; 100 shares of General Motors Corp.; 100 shares of Stattuck Co.; and 630 shares of American Telephone and Telegraph Co. She endorsed the securities. Alfred left and later returned and brought with him a disclaimer certificate with respect to the 630 shares of American Telephone and Telegraph Co. stock, which Charlotte signed and Joseph Simon notarized. Irene, Alfred, and Charlotte then discussed the possibility of Charlotte's moving into the apartment house in which Alfred and Irene lived and Charlotte's going to Florida for the winter. Charlotte stayed with Irene and petitioners' son, Alan, until about 10 o'clock in the evening. Each of the four banks which issued the checks drawn to Alfred is located in a busy commercial section of New York *234 City and each had security personnel. At least three of the banks had a special procedure for handling a withdrawal by a customer of all funds in an account to close out the account. On December 16, 1964, Alfred deposited to his bank account the four checks and delivered the stocks to his broker, Merrill Lynch, Pierce, Fenner, and Smith. All the shares except for the American Telephone and Telegraph Co. shares were in the name of Alfred. The latter were in the name of Charlotte and were accompanied by the signed and notarized disclaimer certificate. At noon on December 16, 1964, Irene and Charlotte went shopping. On December 17, 1964, Adele called Miller and put Charlotte on the telephone to talk to Miller. Adele and Charlotte, later that day, met Miller at his office, and Miller made an appointment to see an assistant district attorney the following day with respect to filing a criminal complaint against Alfred. A discussion was held by Adele, Charlotte, and Miller with one of the assistant district attorneys in the complaint department, and Miller proposed a criminal complaint against Alfred on behalf of Charlotte, but no criminal complaint was filed against Alfred. Miller *235 made no attempt to have the banks stop payment on the checks. 93 On December 30, 1964, Charlotte filed suit in the Supreme Court of New York naming Alfred as defendant. The complaint alleged in part: 8. That on or about the 15th day of December, 1964, said defendant visited plaintiff at her home and represented to her that he required of her that she exhibit to him all her personal property listed in said Schedule "A", hereto annexed and made a part hereof, so that he might evaluate the same for insurance and tax purposes, and upon his express promise to return same to plaintiff immediately upon completion of such evaluation for said specific purposes. 9. That plaintiff, in reliance upon the said express representations, and promise of the defendant to return all said personal property to her, and because of her faith and trust in him, as her son, exhibited all said items to the defendant. 10. Instead of evaluating the said property, defendant refused and failed to return all of said items to plaintiff, although duly demanded by plaintiff. 11. That by reason of such acts of the defendant, plaintiff then and there became and remained nervous and greatly distressed both *236 in mind and body, and for a considerable time thereafter lost the entire control of her will. 12. That while plaintiff was in said described condition, defendant informed her that unless she permitted defendant to retain all of said items of her personal property, and also deliver to him all the shares of stock which she owned in said corporations by endorsing over the certificates of shares of stock to him, and also withdraw all the sums of money which she had on deposit in the following savings banks: TRADE BANK & TRUST Co., FIRST NATIONAL CITY BANK, EMIGRANT INDUSTRIAL SAVINGS BANK and MANUFACTURERS TRUST Co., that said defendant would disassociate himself from the active management of all of said four (4) corporations, and in which corporations defendant is acting as president and director, in addition to his duties as General Manager, and advised plaintiff he would cause the said corporations and business to go bankrupt by reason of such disassociation. 13. That plaintiff, being desirous of saving said business from defendant's threats of alleged bankruptcy, and in fear that her son, said defendant, would carry out his threat to leave said business unmanaged and its personnel *237 and cash operations not be properly and adequately supervised, and induced by such fears and threats, did deliver to defendant said items of personal property and did sign and deliver to him the assignments on the reverse side of said several certificates of stock and did withdraw said various sums from her savings banks and did deliver the same to the defendant. 14. That said defendant was not entitled to receive from her the said items of personal property or the sums of money above referred to or the delivery of the Assignments of said several shares of stock nor any other sums or personal property whatsoever, but that the same was illegally and unlawfully demanded and received by defendant and plaintiff delivered all of same under protest and duress and by virtue of said threats. Schedule "A" attached to the complaint listed the sums of money totaling $62,007.86 and the securities of the total value of $60,527.50 here involved as well as other properties. Trial was not held on Charlotte's suit against Alfred until April 26, 1966, and throughout most of the period from the time the suit was filed until it was tried, Alfred remained in charge of the family businesses. Also, *238 during that period Irene and Alfred maintained a friendly relationship with Charlotte. They talked to her often by telephone until the early part of 1966 when the listed telephone in the apartment where Charlotte lived was removed and a telephone with an unlisted number was installed in Adele's name. On April 8, 1966, Alfred, Irene, and Charlotte's brother Joseph Salazar visited Charlotte at her apartment. Adele attempted to bar their entry into the apartment and hysterically demanded that Alfred return the money. Judgment and a written opinion were rendered on July 15, 1966, in the case of Charlotte Altman v. Alfred Altman, an unreported case (S. Ct. New York County, N. Y., Index No. 19356/64). The opinion states: Defendant's apparent defense to this action is that the property involved was given to him by his mother as a gift. He did not, however, see fit to appear at the trial and present his version as to how and when such alleged "gift" took place, and the witnesses presented on his behalf were hardly in a position to testify to any such gift since concededly no one else was present in plaintiff's apartment on December 15th when defendant admittedly came into possession *239 of his mother's property. Moreover, their testimony obviously reflected their relationship to the defendant and wholly failed to impress the court. It may also be noted that defendant has failed to submit any briefs or memoranda to support his position. 94 While the law is powerless to compel adherence to the Fifth Commandment, it does provide recourse in cases of this type by reason of the extreme caution with which it views alleged "gifts". The law never presumes a gift. ( Matter of Bolin 136 N. Y. 177.) Instead it imposes upon the person claiming as donee the burden of showing by clear and convincing evidence each and every element essential to establish a gift. (See Matter of Kelly, 285 N. Y. 139; Re Malysiak's Estate, 15 A.D. 2d 586; Duboff v. Duboff, 18 Misc. 2d 1050.) This is especially true in a case of this type where a confidential relationship exists between the parties and where the parties do not deal on terms of equality. The burden herein is clearly upon the defendant to prove that the property which is the subject matter of this action was freely and voluntarily transferred to him by his mother, the plaintiff *240 herein. (See Reoux v. Reoux, 3 A.D. 2d 560 and cases therein cited, affd. 4 N. Y. 2d 1022; cf. Cassidy v. Cassidy, 285 App. Div. 1040.) To constitute a valid gift it is essential to show that the transfer of such property was made with donative intent. ( Beaver v. Beaver, 117 N. Y. 421; Matthews v. Brooklyn Sav. Bank, 208 N. Y. 508.) To establish donative intent the evidence must show that the donor intended to part absolutely with the ownership of the thing given and such evidence should be inconsistent with any other intention or purpose. (See Matter of Bolin, supra; Gannon v. McGuire, 160 N. Y. 476; Matter of Green, 247 App. Div. 540.) There is not a scintilla of evidence in the record herein to support defendant's claim of a "gift" of any part of the property in question. On the contrary, the evidence clearly, convincingly and uncontradictedly establishes that defendant took advantage of his confidential relationship with his mother to ruthlessly and callously obtain possession and control of her assets and that her transfer of said assets to him was by no means her free *241 and voluntary act, but was, rather, occasioned by force and coercion on his part. * * * Miller made no effort to have Alfred removed from management of the family businesses until August 4, 1965, when he notified Alfred that there had been a meeting of the stockholders of Mrs. Altman and DeLuxe Strudel Co. on July 27, 1965, and that Alfred was no longer a director or officer of that company. Adele was elected president of that company and also served as manager. Alfred continued in charge of the other family businesses until shortly before the trial of the suit in the Supreme Court of New York. Alfred left the family businesses and the United States in April 1966 prior to the trial of the suit against him and did not testify at the trial in the Supreme Court of New York. Irene assumed full management of the businesses in April 1966 and operated the businesses until she and petitioners' son joined Alfred in July 1966. Charlotte is presently living in a nursing home and is about 80 years old. Petitioners paid $1,467.71 as State taxes in their taxable year 1964 and made charitable table contributions of $200 in that year. Petitioner Irene Altman was aware that her husband, Alfred, *242 had received the cash and securities transferred to him on December 15, 1964. Petitioners on their Federal income tax return did not report any income with respect to the moneys and stock transferred by Charlotte to Alfred in 1964. They claimed deductions for contributions, interest, and taxes in the amounts of $300, $311.27, and $1,754.62, respectively. Respondent in his notice of deficiency increased petitioners' income as reported by $122,535.36 with the explanation that this amount was additional unreported taxable income represented by funds obtained by Alfred from his mother's bank accounts and the fair market value of securities transferred to Alfred. Respondent disallowed the entire deductions claimed by petitioners for charitable contributions, interest, and taxes with the explanation that petitioners had failed to show that they were entitled to the claimed deductions. Opinion Section 61 states that except as otherwise provided, gross income means all income from whatever source derived. Section 102 provides that gross income does not include the value of property acquired by gift. Petitioners' contention in this case is that the cash and securities transferred *243 by Charlotte to Alfred on December 15, 1964, were a gift. The State trial court decided on the basis of New York State law that the transfer was not a gift. This Court, however, is not bound by the State court's determination of the issue but must make a determination based on the evidence presented in this case. 95 There are a number of cases involving Federal income tax which set forth the criteria necessary to a gift inter vivos. These requirements, as stated in Adolph Weil, 31 B.T.A. 899, 906 (1934), affirmed 82 F. 2d 561 (C.A. 5, 1936), certiorari denied 299 U.S. 552, are: (1) a donor competent to make the gift; (2) a donee capable of taking the gift; (3) a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift, in praesenti; (4) the irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it; (5) a delivery by the donor to the donee of the subject of the gift or of the most effectual *244 means of commanding the dominion of it; (6) acceptance of the gift by the donee; The burden of proof that Charlotte made a gift to Alfred is on petitioners. This record is totally inadequate to carry that burden in that it fails to show any intention on the part of Charlotte to make a gift of the moneys and shares of stock to Alfred. Neither Alfred nor Charlotte testified at the trial of this case. Petitioners' entire reliance in support of their position in this case is on testimony by Irene and the hostility toward Alfred evidenced by Adele when she was called as a witness by petitioners. Petitioners were permitted to examine her as a hostile witness. Irene's testimony was to the effect that Charlotte had told her on several occasions in the early part of December 1964 that she wanted to make a gift to Alfred, that she always loved him very much, that he was always very good as a son and an individual and she wanted to make him a gift. This testimony, as well as other testimony by Irene of statements made by Charlotte, was received not as proof of the statements made, but only for the purpose of showing statements made by Charlotte which might tend to show her intent with respect *245 to the moneys from the bank accounts and the stock which she transferred to Alfred. Obviously, a mere statement of a mother in the early part of December 1964 of her desire to make a gift to her son has little bearing on whether such amounts as are involved in this case were in fact gifts. The other testimony of Irene on which petitioners rely involves the events that transpired in Alfred's and Irene's apartment when Charlotte and Alfred arrived at the apartment about 11 a.m. on December 15, 1964. In this regard, Irene testified as follows: my mother-in-law said that she had just been to the banks with Alfred and that she has a gift for him and that she was very happy to be able to give this to her son because he is such a good son at all times. And she took checks out of her handbag and she showed them to me and she said that she was going to give these to Alfred and that she was happy to do it. And I looked at them and I said, "that's very generous of you Mother." And I asked her how she felt and we had talked about her going to Florida before this because she went to Florida every year and she said that she would like to go. * * * My mother-in-law took out securities from *246 her handbag and she said she wanted to give those to Alfred as well and she showed those to me. * * * And she signed the backs of the securities. She laid them out on a table. This testimony by Irene is totally unpersuasive. Cetainly, Irene's reference to Charlotte's referring to the fact that she was going to "give" the checks and the stocks to Alfred, even if an exact recollection of statements made by Charlotte which is very doubtful, would not necessarily imply a gift for the use and benefit of Alfred as distinguished from transferring the amounts to Alfred for him to hold for Charlotte's benefit. However, Irene's testimony of what transpired at 11 o'clock on the morning of December 15, 1964, has no weight in disposing of the issue in this case since if in fact Alfred had frightened and intimidated his mother in her apartment earlier on the morning of December 15, Charlotte would likely have still been under Alfred's influence and frightened by Alfred at 11 a.m., so that anything stated at that time would not necessarily show any free-will intent of Charlotte. What transpired between Alfred and Charlotte in Charlotte's apartment earlier in the morning of December 15, 1964, is *247 the crucial, factual problem in this case. Either Charlotte or Alfred could have testified with respect to the events that transpired in Charlotte's apartment prior to 11 a.m. on December 15, 1964, but neither was called as a witness. The hostility between Adele and Alfred is apparent throughout the entire record. 96 For this reason we have given very little weight to Adele's testimony. However, the evidence in this record as a whole supports the conclusion that Charlotte did not intend the checks and stock as a gift to Alfred. Only 3 months prior to December 15, 1964, Charlotte refused to sign an agreement with respect to control of the family businesses. Less than 1 month prior to December 15, 1964, Charlotte had executed a will which specifically provided that Alfred would receive 51 percent interest in the family businesses upon Charlotte's death and that Adele would receive 49 percent interest and the balance of Charlotte's property would be divided equally between them. It would take strong evidence to persuade us that Charlotte would completely reverse her intentions with respect to the disposition of her estate as between her two children in a 20-day period. Not only *248 is there no such strong evidence in this record, but rather the record is totally lacking in evidence of an intent by Charlotte to make a gift of the moneys and stock to Alfred. Considering the hostility between Adele and Alfred, it may be that Alfred originally took his mother's property to remove it from Adele's reach and conserve it from possible exhaustion by Adele. However, if such were a fact, it would show that Alfred was holding the property for his mother and not that Charlotte made a gift to Alfred. If this were the situation, Alfred converted the property to his own use when he retained it after Charlotte attempted to have her property returned. This attempt by Charlotte occurred not later than December 30, 1964, when her suit against Alfred was filed. Insofar as this record shows, petitioners held and used the property transferred to Alfred on December 15, 1964, under their complete dominion and control during the year 1964. Since the transfer of the property was not a gift, the value of the property is includable in petitioners' gross income for the year 1964. David L. Zips, 38 T.C. 620 (1962). Petitioners' argument that Irene should be relieved of any *249 liability under section 6013(e) for the deficiency in income tax to the extent such liability is attributable to the omission from petitioners' gross income of $122,535.36 is without merit. The purpose of section 6013(e) is to relieve the "innocent spouse" of liability where she could establish that she had no knowledge of, or reason to know, that her spouse had received income. For section 6013(e) to apply, Irene would be required to establish that she did not know that Alfred had received the securities and cash from Charlotte. Irene knew Alfred had received the cash and securities, and as we stated in Herbert I. Joss, 56 T.C. 378 (1971), this fact is sufficient to prevent Irene's being entitled to the relief provided for in section 6013(e). The evidence presented by petitioners to support their claimed itemized deductions, except as to $1,467.71 paid in State taxes, which amount respondent on brief concedes to be deductible is minimal. However, from Irene's testimony, we have concluded that petitioners made deductible charitable contributions of at least $200 and therefore hold that they are entitled to a charitable contribution deduction in the year 1964 of $200. *250 Petitioners offered no evidence whatsoever to support their claimed deductions for interest. Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954.↩