BETTY R. LEBARON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
LeBaron v. Commissioner
Docket No. 15252-89.
United States Tax Court
T.C. Memo 1990-592; 1990 Tax Ct. Memo LEXIS 669; 60 T.C.M. (CCH) 1275; T.C.M. (RIA) 90592; November 19, 1990, Filed *669 Decision will be entered for the respondent as to the deficiencies and for the petitioner as to the additions to tax. Charles R. Billings, for the petitioner. Richard D. Ames, for the respondent. TANNENWALD, Judge.
TANNEWALD MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in, and additions to, petitioner's Federal income taxes as follows: Addition to Tax
Year
Deficiency
[1] Sec. 6653(a)
1979
$ 1,102,877.70
$ 54,909.04
1980
34,486.97
4,160.63 *670 Respondent having conceded the additions to tax, the issue for decision is whether petitioner had unreported income in 1979 and 1980 in the amounts of $ 1,643,094 and $ 80,000, respectively, or whether these amounts represented nontaxable gifts. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated herein by reference. At the time of the filing of her petition, petitioner resided in Longview, Texas. In 1960, petitioner began working for E. J. Moran, an independent oil and gas operator with significant mineral interests, as his secretary and bookkeeper and sole employee. When petitioner first began working for Mr. Moran, she was married, but she subsequently divorced in about 1964. Also, at this time, Mr. Moran was married; however, his wife, Hazel Moran, died in 1964. After Mrs. Moran's death, petitioner took over the maintenance of Mr. Moran's home, and after about 2 or 3 years, according to petitioner, the relationship between Mr. Moran and petitioner developed into an intimate one. At this time, Mr. Moran's only living relatives were a sister-in-law, a nephew, and a grandnephew; Mr. and Mrs. *671 Moran had never had children. In 1973, petitioner began living with Mr. Moran. During the later years of his life, Mr. Moran became ill and was hospitalized in 1978. He was again admitted to the hospital on February 24, 1979. On March 8, 1979, he was discharged to a nursing home where he remained until his death on September 23, 1982, at the age of 87. In 1980, petitioner married James Tally, a friend of Mr. Moran, who died the next year of a heart attack. Petitioner had signatory authority on Mr. Moran's accounts. On March 15, 1978, Mr. Moran executed a power of attorney in favor of petitioner and Paul L. Barr, Mr. Moran's accountant. Thomas J. Carmody, a member of the same firm as Mr. Barr, became Mr. Moran's accountant after Mr. Barr's death in April 1979. Mr. Carmody was also petitioner's accountant from the time he prepared her 1979 return. During 1979, shares of stock valued at $ 1,400,000 were transferred from Mr. Moran's accounts to petitioner's stock account with Drexel, Burnham, and Lambert (Drexel). [2] The bulk of these stocks were sold shortly after the transfers. On numerous occasions, petitioner withdrew the funds from her account at Drexel shortly after *672 their sale. Also during 1979, petitioner deposited a total of $ 75,125 received from Mr. Moran into her bank account at the Republic National Bank in Dallas, Texas, and into her account with Drexel. Further during this same year, petitioner caused an $ 18,312 check to be written on Mr. Moran's account, the proceeds of which were used to purchase a Cadillac automobile titled in her name. During 1980, petitioner deposited into her bank account at Mercantile Bank in Dallas, Texas, and into her account at East Texas Bank in Longview, Texas, a total of $ 80,000 received from Mr. Moran. On June 25, 1976, Mr. Moran executed his last will and testament. In his will, Mr. Moran made the following specific bequest to petitioner: To my secretary, BETTY LeBARON, provided that she is still *673 in my employ at the date of my death, the sum twenty-five thousand dollars ($ 25,000).
The will also provided for other specific bequests to Pamela Phillips Garrison and Michael Phillips (the son and daughter of Mr. Moran's friends B. F. and Helen Phillips), D. Hustead, B. G. Hustead, Jimmie Hustead Hagler, and Joan Hustead Wilson. The will further provided that: (1) Fadre Moran, the wife of Mr. Moran's deceased brother, should be allowed to use and occupy his home during her lifetime and directed the executor to purchase an annuity contract paying $ 400 per month on her behalf; (2) one-fourth of the residue of the estate be held in trust for Michael Patrick Moran, the son of Mr. Moran's nephew Melville Michael Moran; (3) one-half of the residue be delivered to the University of Dallas as the Hazel Moran Scholarship Fund; (4) one-eighth of the residue be delivered to the Dallas YMCA Endowment Fund as the E. J. and Hazel Moran Fund; and (5) one-eighth of the residue be delivered to the Dallas Service for Blind Children, Inc., as a memorial to his wife. Paul L. Barr was appointed as executor and the First National Bank in Dallas as successor executor. On June 1, 1978, Mr. *674 Moran executed a first codicil in which he made a specific bequest of $ 250,000 to his nephew Melville Michael Moran. On October 25, 1979, Mr. Moran executed a second codicil in which he changed the executor to Jack C. Franklin, his stockbroker, while maintaining the same successor executor. This second codicil was executed by Sam G. Winstead, Mr. Moran's attorney, on his behalf while he was in the nursing home. At no time did Mr. Moran alter his initial bequest to petitioner or appoint petitioner as executrix or successor executrix. Gift tax returns were filed by or on behalf of Mr. Moran for periods ending March 31, 1979, June 30, 1979, and December 31, 1979. The returns were prepared by Mr. Carmody based upon information that he received from petitioner; he never discussed the returns with Mr. Moran. The return for the period ending March 31, 1979, reflects gifts to Burleson Arch Hopkins, Mr. Moran's long-time personal friend and business associate (900 shares Southland Royalty Corp. valued at $ 48,150), Dorsey Ore Hustead (500 shares Southland Royalty Corp. valued at $ 26,750), as well as to petitioner (1000 shares Southland Royalty Corp. valued at $ 53,500 and $ 25,000 cash). *675 The return for the period ending June 30, 1979, reflects gifts to petitioner of 500 shares Phillips Petroleum and 500 shares Marathon Oil having an aggregate value of $ 56,625. The return for the period ending December 31, 1979, reflects gifts to petitioner of 200 shares Chubb Corp., 4,548 shares Diamond Shamrock, 5,800 shares Louisiana Land & Exploration, 1,200 shares Marathon Oil, 16,287 shares Southland Royalty, and 1,128 shares Signal Companies having an aggregate value of $ 1,455,424.50. On March 11, 1983, InterFirst Bank (InterFirst), formerly First National Bank in Dallas, executor of Mr. Moran's estate, filed claims for refund of the gift taxes paid, alleging that petitioner had wrongfully transferred properties to herself, or that, if the transfers were in fact made, Mr. Moran lacked the mental capacity to make valid gifts. [3] *676 On April 26, 1983, InterFirst instituted a proceeding in the Probate Court of Dallas County, Texas, against petitioner for the wrongful transfer of Mr. Moran's property. On January 30, 1984, the suit was settled. A judgment was entered requiring that petitioner transfer to InterFirst certain real and personal property. [4]
OPINION The issue before us is whether the amounts asserted by respondent are income from the proceeds of embezzlement or misappropriation of funds by petitioner from Mr. Moran ( James v. United States, 366 U.S. 213 (1961)) or gifts by him to petitioner not includable in income (section 102). Although the deficiency notice asserted that such proceeds were derived from "embezzlement," the case was tried by the parties on the basis of gift versus misappropriation of funds without regard to the particulars of embezzlement under the applicable State law (Texas). We also note that respondent has not questioned the competency of Mr. Moran at the time of the transfers to petitioner. Cf. Zips v. Commissioner, 38 T.C. 620 (1962); *677 Eaton v. Commissioner, T.C. Memo. 1977-79. The issue is one of fact, and the burden of proof is on petitioner. Rule 142(a). Petitioner's entire case rests upon her testimony. She asserts that such testimony is sufficient to make a prima facie case of gifts and that, since respondent's position rests upon assumptions and speculation and not upon contradictory evidence, she has satisfied her burden of proof. In so asserting, petitioner misconceives the nature of her burden. Since her testimony is obviously self-serving and is uncorroborated, we are not required to accept it as gospel and therefore conclude that petitioner has made a prima facie case; this is particularly true since we have found her testimony vague and evasive in a significant degree and highly questionable in the absence of corroboration. Commissioner v. Smith, 285 F.2d 91, 95-96 (5th Cir. 1960), affg. a Memorandum Opinion of this Court. See also Fleischer v. Commissioner, 403 F.2d 403, 406 (2d Cir. 1968), affg. a Memorandum Opinion of this Court; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Pascarelli v. Commissioner, 55 T.C. 1082, 1095 (1971), *678 affd. without published opinion 485 F.2d 681 (3d Cir. 1973). Initially, we note that petitioner was somewhat handicapped in that the two persons who could have been the most persuasive sources of confirmation of her testimony, Mr. Moran (the alleged donor) and Mr. Franklin (the stockbroker who executed the transfers to petitioner), were dead. Moreover, the stock powers, pursuant to which the transfers were executed, were no longer available. But the absence of proof does not relieve petitioner of her burden. Burnet v. Houston, 283 U.S. 223 (1931). Our difficulties, however, stem not from the unavailability of the foregoing sources of proof, but from the fact that petitioner did not tap other sources which should have been available. Petitioner described her relationship with Mr. Moran as "an intimate relationship and--that was--as close as a woman could be to a man, really, as much as a wife." She went on to testify that the reason she and Mr. Moran did not marry was because of his religious beliefs. While we could not have expected testimony directly confirming the "intimacy" of the relationship, we find it hard to believe that petitioner was *679 unable to produce anyone who could have supported her testimony, at least to the extent of describing the normal public manifestations of such a relationship. In this context, we think it significant that Mr. Hopkins, a long-time business associate and personal friend of Mr. Moran, who visited with him in the nursing home until shortly before his death and who knew of the close relationship between Mr. Moran and his wife, was unable to testify of his own knowledge as to any relationship between Mr. Moran and petitioner which went beyond that of businessman and his secretary. [5] Further, although Mr. Hopkins testified that he received a gift of stock from Mr. Moran and that he had learned of another substantial gift by Mr. Moran to one of his oil pumpers, he did not know of any gifts having been made to petitioner. Nor did Mr. Carmody, who knew Mr. Moran and dealt with him over a long period of time, throw any light on the existence of any relationship between Mr. Moran and petitioner beyond a business relationship. The same is true of Mr. Winstead, who was Mr. Moran's lawyer and drew the will and the codicils and in whom one would have expected Mr. Moran to have confided about *680 such a substantial beneficiary of his generosity. Finally, we note that no one from the nursing home testified, although such a person could have provided some evidence as to the frequency and length of visits by petitioner to Mr. Moran. The long and short of the matter is that we are not satisfied either that petitioner's testimony is itself sufficiently credible or that there is other credible substantiating evidence in the record (see Clower v. Commissioner, T.C. Memo. 1990-74) to enable us to conclude that she has carried her burden of proof. We are reinforced in our conclusion by several facts which impact petitioner's credibility: (1) that she married while Mr. Moran was still living, an act which while not necessarily inconsistent with the claimed "intimate relationship" is, to say the least, *681 strange; (2) that Mr. Moran did not indicate in his will, or by an accompanying letter, that he was not being more generous to petitioner because he had already made or contemplated making substantial gifts to her--an action that would have been a most natural way to confirm the existence of an "intimate relationship" and protect petitioner from precisely the post-death claims that were in fact made against her; and (3) that petitioner settled those claims by transferring property, see pages 6-7, and n.4, supra, a fact which can be considered in evaluating petitioner's credibility under the "bias or prejudice" exception to Rule 408, Federal Rules of Evidence. See also Brocklesby v. United States, 767 F.2d 1288, 1291-1293 (9th Cir. 1985). Our disposition of this case makes unnecessary any consideration of the possible application of the "claim of right" doctrine, which was suggested at trial, and the accompanying question of the location of the burden of proof on that issue. To reflect respondent's concession as to the additions to tax, Decision will be entered for the respondent as to the deficiencies and for the petitioner *682 as to the additions to tax. Footnotes
1. All statutory references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The parties have so stipulated. There are unexplained discrepancies between the stipulated amounts, the amounts reported on the gift tax returns, see p. 6, infra↩, and the amounts determined in the deficiency notice.
3. The record does not reveal what action, if any, was taken on the claims.↩
4. The Court sustained petitioner's objection to the receipt into evidence of the terms of the settlement. See Rule 408, Federal Rules of Evidence. Petitioner did not object to the receipt into evidence of the final judgment which reflected the fact of settlement and the transfer of property by petitioner. See p. 11, infra↩.
5. The most Mr. Hopkins could say was that he saw petitioner at Mr. Moran's home one Sunday and that petitioner told him of an incident which might have indicated a more personal relationship.↩